EXHIBIT 1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### MIDLAND/ODESSA DIVISION

VIRTAMOVE, CORP.,

        Plaintiff,

v.

GOOGLE LLC,

        Defendant.

Case No. 7:25-cv-00347-DC-DTG

**JURY TRIAL DEMANDED**

## VIRTAMOVE, CORP.'S OPPOSITION TO GOOGLE'S MOTION TO DISMISS COMPLAINT

**TABLE OF CONTENTS**

I.      INTRODUCTION ........................................................................................... 1

II.     OVERVIEW OF THE '762 PATENT............................................................ 2

III.    THE '762 PATENT CLAIMS ARE ELIGIBLE UNDER 35 U.S.C. § 101 .................. 3

    A.  *Alice* Step One: Based on the intrinsic record, Claim 17 is directed to a computer-specific solution to a computer-specific problem, which renders it *not abstract* as a matter of law. ....................................................................................3

    B.  *Alice* Step Two: Google cannot show Claim 17 lacks inventive concepts. Instead, it relies on legally irrelevant arguments and ignores facts and allegations that must be accepted as true at this stage—and which are fatal to the Motion..................................10

        1.  Google fails to show that all limitations are well-known, conventional, and routine, either taken individually or as an ordered combination....................................10

        2.  Claim 17 does explain "how" to accomplish the desired result. ....................................11

    C.  Google also fails to show ineligibility for any other claim............................................15

IV.     INFRINGEMENT ............................................................................................. 16

    A.  Direct infringement is well pleaded................................................................16

    B.  Induced infringement is well pleaded..............................................................18

    C.  Contributory infringement is well pleaded. ....................................................19

    D.  Pre-suit knowledge is well pleaded. ...............................................................19

    E.  Post-suit knowledge also prevents dismissal of indirect infringement..........................20

V.      CONCLUSION................................................................................................ 20

# TABLE OF AUTHORITIES

**Cases**

*Aatrix Software, Inc. v. Green Shades Software, Inc.*,
  882 F.3d 1121 (Fed. Cir. 2018) ............................................................................... 15, 20

*BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC*,
  827 F.3d 1341 (Fed. Cir. 2016) ............................................................................... 10

*BillJCo, LLC v. Apple Inc.*,
  583 F. Supp. 3d 769 (W.D. Tex. 2022) .................................................................... 19, 20

*Cellspin Soft, Inc. v. Fitbit, Inc.*,
  927 F.3d 1306 (Fed. Cir. 2019) ............................................................................... 10

*DDR Holdings, LLC v. Hotels.com, L.P.*,
  773 F.3d 1245 (Fed. Cir. 2014) ............................................................................... 5, 9, 10

*Hawk Tech. Sys., LLC v. Castle Retail, LLC*,
  60 F.4th 1349 (Fed. Cir. 2023) ................................................................................ 6

*Intell. Ventures I LLC v. Erie Indem. Co.*,
  850 F.3d 1315 (Fed. Cir. 2017) ............................................................................... 12

*Intell. Ventures I LLC v. Symantec Corp.*,
  838 F.3d 1307 (Fed. Cir. 2016) ............................................................................... 4, 5, 8

*McRO, Inc, v. Bandai Namco Games Am.*,
  837 F.3d 1299 (Fed. Cir. 2016) ............................................................................... 3

*SRI Int'l, Inc. v. Cisco Sys., Inc.*,
  930 F.3d 1295 (Fed. Cir. 2019) ............................................................................... 9

*Universal Secure Registry LLC v. Apple Inc.*,
  10 F.4th 1342 (Fed. Cir. 2021) ................................................................................ 6

**Statutes**

35 U.S.C. § 101 ............................................................................................................ 1

# I.    <u>INTRODUCTION</u>

Google asserts that a patent providing computer-specific solutions to computer-specific problems is nevertheless invalid for claiming ineligible subject matter under 35 U.S.C. § 101. This patent claims a specific advance in computer architecture, namely, a specific means of allowing applications to execute on an incompatible computer platform. Google does not even allege that this focus of the claims is abstract. And even if that result *were* abstract, the patent claims a detailed method, including specific computer-implemented functionality that was identified as unconventional during prosecution, for accomplishing the result.

Rather than engage with the actual computer-specific problems solved by the patent, Google takes specific limitations out of context and invents new limitations not present in the claims, saying that the patent is instead directed to "filtering" and "replacing," comparing it to filtering spam e-mails or replacing credit card numbers. Google's attempt to rewrite the claims to remove both their technological context and their technological objectives, and then on that basis argue the claims are abstract, is plainly contradicted by governing law. The Court should reject Google's challenges under *Alice* Step One. If the Court reaches *Alice* Step Two, it should resolve factual disputes over the inventiveness of the claimed invention in VirtaMove's favor and deny Google's motion at the pleading stage.

Google fails to articulate any basis to dismiss the allegations of direct infringement. The Complaint includes specific allegations, with directly relevant quotations from public documentation, showing the "filtering" limitation in the Accused Products. Google's Motion simply ignores those allegations and facts, instead oddly focusing on a third-party statement about cat names. Google's complaints about indirect infringement are likewise legally and factually

deficient. But if the Court is inclined to dismiss the indirect allegations, then it should do so with leave to take discovery and amend.

## II.   OVERVIEW OF THE '762 PATENT

Claim 17 of the '762 Patent is directed to a specific means of enabling a software application, designed to execute on a first computer platform, to execute on an incompatible computer platform. The specific method by which this is accomplished includes, in a particular type of computer system meeting certain requirements including:

> providing a first and second group of files, the first group being designed to execute on the first computer platform and including a software application, and the second group being distributed with or are specific to an operating system required to execute the first software application, [limitation 17(a)]

> using the second group of files in place of the associated local system files within an incompatible computer platform's operating system normally used to perform a same task, which local system files remain resident on the incompatible computer platform, [limitation 17(b)] and

> executing runtime software for managing a dynamic state and file location of the first software application, the runtime software filtering system service requests made by the first software application and modifying values that would have been provided by the operating system, including providing predetermined values instead of values related to an identity of the incompatible computer platform. [limitation 17(c)]

The patentee further emphasized the importance of using files "in place of" other existing files. The patentee distinguished this approach (in which the local system files remain resident on the computer platform) from the prior art approach of *replacing* incompatible operating system files with compatible files in prosecution of an ancestor application to the '762 Patent. *See* Ex. 1 (9/3/2008 Applicant Remarks in 10/939,903 Application) at 16–17 (distinguishing prior art that "instructs replacing older versions of software with newer versions by writing over older versions," and that "teach[es] replacement of older files with newer versions," in contrast to the claimed method of "having different versions of the same software on the system at the same time").

The specific focus of this claim on enabling execution on an incompatible platform through the specific claimed means is reflected in the (limiting) claim preamble and, more concisely, in the title of the patent itself: "system including run-time software to enable a software application to execute on an incompatible computer platform." '762 Patent, title. For example, the specification explains that one aspect of the invention enables a Solaris 8 application to run on a different ("incompatible") operating system version, Solaris 10. *Id.* at 11:16–36. During prosecution, the relied on the "incompatible" limitation to overcome prior art. Ex. 2 (12/15/2009 Applicant Arguments) at 19.

III.   **THE '762 PATENT CLAIMS ARE ELIGIBLE UNDER 35 U.S.C. § 101**

A.    *Alice* **Step One: Based on the intrinsic record, Claim 17 is directed to a computer-specific solution to a computer-specific problem, which renders it** *not abstract* **as a matter of law.**

The Federal Circuit has "previously cautioned that courts must be careful to avoid oversimplifying the claims" in a patent eligibility analysis by looking at them generally and failing to account for the specific requirements of the claims." *McRO, Inc, v. Bandai Namco Games Am.,* 837 F.3d 1299 (Fed. Cir. 2016) (reversing district court for accepting an oversimplification of the claims under Step One). *McRO* and related cases cautioned against ignoring key limitations by viewing the claims with too broad a lens. However, as explained below, Google's motion oversimplifies the claims by both ignoring the ultimate purpose of the claimed invention and mischaracterizing individual claim limitations in isolation.

As noted above in Section II, claim 17 is directed to a specific means of ***enabling a software application***, designed to execute on a first computer platform, ***to execute on an incompatible computer platform***. But nowhere in Google's motion does Google even *attempt* to engage with the focus of the invention on enabling application software to execute on an incompatible computing platform. Instead, the entirety of Google's "Argument" section regarding

patent eligibility does not **once** discuss the concept of bridging the incompatibility of software applications and computing platforms, except a quote of this concept from VirtaMove's complaint followed by Google's mischaracterization of this concept as "filtering or replacing incompatible resources." Mot. at 12; *see generally* Mot. at 7–15. (As noted above and discussed in further detail below, *replacing* incompatible files is a prior art solution that the applicant expressly distinguished.)

Stripping away the character of the claims, Google argues that the claims are merely directed to "filtering resources and replacing resources," Mot. at 9.[1] This strips away the claimed advance, contrary to what the specification and file history call for. The inventors claimed a technological improvement in ***executing applications on incompatible computer platforms***, not merely "filtering" and "replacing" resources in general, and Google's failure to engage with the ***actual*** advance of the claims is fatal to its Motion.

For example, Google confidently argues that claims "that apply filtering to elements of a computing system are abstract." Mot. at 8 (citing *Intell. Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1313 (Fed. Cir. 2016)). The cited case is about filtering *spam e-mails*—an "idea" with no plausible relationship to the claims at issue here. Specifically, the claim at issue in that case

---

[1] Google points to a wide and shifting list of supposedly abstract idea(s) in the claim, *e.g.* "the abstract idea of distributing applications," Mot. at 7, "filtering calls between the applications and the kernel," *id.* at 8, "filtering resources and replacing resources," *id.* at 9, "replacing or filtering application libraries," *id.*, "adapting or replacing resources," "'filtering' and using files 'in place of' other files," *id.* at 10, and "filtering or replacing incompatible resources," *id.* at 12. Many of these are either incorrect or rely on implicit claim constructions. For example, the notion of "distributing applications" does not appear in claim language itself. The word "distributed" is used in a different context, regarding files distributed with or specific to an *operating system*, and in that context "distributed" does not imply a claimed step of "distributing." Google has not identified which claim language should be limited to require (or expanded to encompass) distributing applications, making its interpretation of the claim meaning difficult to apply. Rather than forcing VirtaMove to respond to incomplete and implicit claim construction arguments, the Court should evaluate the claims as written and reserve any claim construction issues for the *Markman* process.

recited a method of "receiving e-mail (and other data file) identifiers, characterizing e-mail based on the identifiers, and communicating the characterization—in other words, filtering files/e-mail." *Intell. Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1313 (Fed. Cir. 2016). The claim did not *apply* filtering, or use a technological step of filtering to accomplish a technological objective. "Filter" was not a claim term at all. *Id.* Rather, filtering e-mails (*e.g.* to exclude spam) was the *purpose* of the claim. The claimed method of filtering was held abstract because it was indistinguishable from the "long-prevalent practice for people receiving paper mail to look at an envelope and discard certain letters, without opening them, from sources from which they did not wish to receive mail based on characteristics of the mail." *Id.*

None of these facts or holdings has any plausible application to the '762 Patent. These claims are not even arguably analogous to a mail recipient disregarding a letter before opening it based on source (*i.e.*, the claimed "filtering" is not even remotely analogous to that discussed in *Symantec*). Rather, the '762 Patent adds, in relevant part, a novel process of filtering system service requests between an application and an operating system kernel, in order to improve the operation of a computer system by enabling software to run on an incompatible computer platform. *See DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1257 (Fed. Cir. 2014) (claim not abstract when "the claimed solution is necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks"). Distilling the claims to "apply[ing] filtering to elements of a computing system" (Mot. at 8) ignores the focus of the claims, which as noted above is enabling software applications to execute on incompatible computing platforms rather than sorting through junk mail.

Google further contends that "claims which replace one resource or input with another within a computing system are abstract." Mot. at 8 (citing *Universal Secure Registry LLC v. Apple*

*Inc.*, 10 F.4th 1342, 1349 (Fed. Cir. 2021) ("*USR*") and *Hawk Tech. Sys., LLC v. Castle Retail, LLC*, 60 F.4th 1349 (Fed. Cir. 2023)). Again, the cases themselves illustrate the degree to which Google is distorting the actual claim context. In *USR*, the claims were directed to "a method for enabling a transaction between a user and a merchant, where the merchant is given a time-varying code instead of the user's secure (credit card) information," followed by several additional steps; the Federal Circuit recognized these as conventional actions. 10 F.4th at 1349. In *Hawk Tech*, the claims were "directed to a method of receiving, displaying, converting, storing, and transmitting digital video" and the Federal Circuit recognized "encoding and decoding image data and… converting forms" are abstract ideas. 60 F.4th at 1353, 1357.

The claims here have nothing to do with replacing a credit card number to complete a commercial transaction as in *USR*, or converting videos from one format to another to store them in *Hawk Tech*. The word "replace" does not even appear; Google is mis-paraphrasing claim limitation 17(b), which recites "using said second group of files in place of the associated local system files normally used to perform a same task, which are resident on the incompatible computer platform as part of the operating system." *See* Mot. at 10 (conflating "using files 'in place of' other files" with "replacing" the other files); *id.* at 4 (identifying limitation 17(b) as one of the "purported advancements" of the claim). But Google's characterization of this limitation is incorrect, because the files in the second group of files do not *replace* the associated local system files. To the contrary, the associated local system files expressly must remain "resident on the incompatible computer platform as part of the operating system." *See* '762 Patent, limitation 17(b).

Indeed, as discussed briefly above, the applicant expressly distinguished these two concepts ("replacing" on the one hand, and using files "in place of" other files on the other hand) during prosecution of the '814 Patent, as emphasized during prosecution of the '814 Patent, of

which the '762 Patent is a continuation-in-part and the specification of which is incorporated by reference. There, applicant distinguished prior art that "directly instructs replacing older versions of software with newer versions by writing over older versions with newer versions" and that "teach replacement of older files with newer versions," in contrast to the inventive concept of "having different versions of the same software on the system at the same time." Ex. 1 at 16–17. As explained in the '814 Patent specification (incorporated by reference into the '762 Patent), "Unlike typical systems, containerized applications are shown on each server having application programs 11a, 11b and related system files 11c. These system files are used **in place of** system files such as library and configuration files present typically used in conjunction with the execution of applications." '814 Patent at 6:65–7:3 (emphasis added).

Google does not even attempt to justify its conflation of (1) the claims' recited use of files in place of other files in the novel manner claimed, with (2) "replac[ing] one resource or input with another." Mot. at 8. Nor could Google plausibly do so at this stage, given the evidence of record that these are two distinct concepts, of which only the former is part of the claimed advance over the prior art. Ex. 1 at 16–17 (distinguishing use "in place of" from "replacing").

Google's second argument is that the claim employs "result-based functional language," rendering it abstract. Google ignores that the verbs "filtering" and "replacing" (setting aside Google's confusion about "replacing") enumerate two parts of *how* to achieve the desired result of enabling applications to execute on an incompatible computer platform. The claims, indeed, recite both specific physical components (as Google acknowledges) and a detailed implementation, including a specific software design for the claimed runtime software. For instance, the preamble recites that the method is performed within "a system having a first software application, which is

7

designed for execution on a first computer platform," and also recites "an incompatible computer platform" with specified components.

The claim further presents specific details regarding how the result is to be accomplished, by providing specific instructions to a POSITA regarding how to perform *each step*. For instance, the claim specifies *what* must be provided in step (a): a "first set of files, comprising a first group of files that include the first software application," and "a second group of files" with specific requirements. The claim also specifies *what* must be executed and *how* in steps (b) and (c). First, the claim recites execution of "the first software application on the incompatible computer platform," specifically by "using said second group of files in place of the associated local system files" and "by accessing files from [the] first set of files in place of operating system files." Second, "runtime software for managing a dynamic state and file location of the first software application" is executed, and the claim provides specific details regarding what that "runtime software include[es]" and how its components such as a "application filter library" operate in connection with that execution.

Google further argues that "the claim's use of filtering or replacing application libraries is at best a field-of-use application to the old idea of adapting or replacing resources," based on the premise that these are "fundamental practices long prevalent." Mot. at 9 (quoting *Symantec Corp.*, 838 F.3d at 1314). But as noted above, Google's framing oversimplifies and mischaracterizes the focus of the claims, which do not "replace" application libraries. And Google presents no argument or evidence that the *actual* focus of the claims (enabling applications to run on incompatible computing platforms) was long prevalent. Even if Google's Motion **had** plausibly alleged the *actual* focus of the claims was long prevalent, there is at very least a factual dispute on this point. Of course, whether enabling applications to run on incompatible computing platforms was a

"fundamental" and "long prevalent" practice is a factual question that would, *at very least*, require some identification of such a practice in the prior art. For example, Google does not identify ***any*** examples in the prior art as even allegedly enabling software applications to run on incompatible computing platforms, much less doing so in a way that uses certain files "in place of" other files in the way recited in the '762 Patent. And if Google attempts to do so in reply, the case should at least be allowed to progress forward so that sufficient facts can be ascertained such that the Court can address the parties' factual dispute.

Contrary to Google's scattered arguments, claim 17 is eligible because it describes a fundamentally unconventional application of computer technology, in which a software application is unexpectedly executed on an "incompatible computer platform" by deploying the claimed steps. Indeed, the Federal Circuit has observed that claims which "***prevent*** the normal, expected operation" of computer functionality and instead "'***override***[] the routine and conventional sequence of events'" are more likely to be patent-eligible. *SRI Int'l, Inc. v. Cisco Sys., Inc.*, 930 F.3d 1295, 1304 (Fed. Cir. 2019) (quoting *DDR Holdings*, 773 F.3d at 1258). Not only do the claims at issue create a result that is contrary to the normal or expected operation of a computer, but they do so at least in part by overriding the routine and conventional sequence of events (i.e., the manner in which values are returned by the local operating system) by "modify[ing] values that otherwise would have been returned by the local operating system" as recited by limitation 17(c).

In sum, Google does not and cannot show that Claim 17 is directed to an abstract idea. Each of Google's diverse characterizations of the claim fails. Rather, Claim 17 solves a technological problem in the operation of computer systems: running application software on an

"incompatible computer platform." The claim does not merely recite that end-result or abstract idea; it captures a specific, multi-step method to accomplish the desired result.

## B. *Alice* Step Two: Google cannot show Claim 17 lacks inventive concepts. Instead, it relies on legally irrelevant arguments and ignores facts and allegations that must be accepted as true at this stage—and which are fatal to the Motion

While Step Two should not be reached here, Google's arguments at Step Two likewise fail because claim 17 recites an unconventional wireless device as of the time of the invention.

### 1. Google fails to show that all limitations are well-known, conventional, and routine, either taken individually or as an ordered combination.

The Step Two inquiry requires considering *all* claim elements—and requires considering the entire claim *as an ordered combination*. *Cellspin Soft, Inc. v. Fitbit, Inc*., 927 F.3d 1306, 1307 (Fed. Cir. 2019). The Federal Circuit's decision in *BASCOM* is particularly instructive and demonstrates that claim 17 is inventive. In *BASCOM*, the Court analyzed a claim for a "content filtering system for filtering content retrieved from an Internet computer network by individual controlled access network accounts" including "a local client computer" and "an ISP server," which, in isolation, were conventional. *BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341 (Fed. Cir. 2016). Despite this, the Federal Circuit held that the ordered combination of elements included an inventive concept, which was described and claimed as "the installation of a filtering tool at a specific location, remote from the end-users, with customizable filtering features specific to each end user." *Id.* at 1350.

*DDR Holdings* is also instructive. *DDR Holdings, LLC v. Hotels.com*, 773 F.3d 1245 (Fed. Cir. 2014). In that case, the Court found that the claims in this case "do not merely recite the performance of some business practice known from the pre-Internet world along with the requirement to perform it on the Internet." Instead, the claims are "necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer

10

networks." The same is true here: claim 17 overcomes a computer-specific problem of software incompatibility.

Other than reliance on its assertion that the claimed steps are performed using allegedly "conventional" hardware components, Google provides no evidence that the limitations, even evaluated in isolation, are well-known, conventional, and routine. For instance, as noted above, the applicant distinguished the prior art's "replacement of older files with newer versions" by noting that the claimed invention "[has] different versions of the same software on the system at the same time" such that one can be used in place of the other, Ex. 1 at 16–17, and Google does not address that distinction or present any reason to disregard it. Nor does Google show that the executing on "incompatible computer platform in which the first software application is not intended to execute," as recited by the preamble, was conventional. These are merely examples, as Google presents no evidence or analysis that of **any** limitation was merely conventional.

Google's allegations are even more deficient when the limitations are considered "as an ordered combination." Google presents only a single conclusory statement on this point, alleging that the ordered combination provides nothing "not already present when the steps are considered separately." Mot. at 13. But Google again fails to account for the claim's express recitation that the steps taken together constitute a "method of executing said first software application on an incompatible computer platform," and Google fails to show how the ordered combination of limitations to accomplish this is even *allegedly* conventional, well-known, and routine (or would necessarily be present simply by performing Google's characterization of the claims as merely reciting "filtering" and "replacing" steps).

### 2. Claim 17 does explain "how" to accomplish the desired result.

The second half of Google's argument fares no better. *See* Mot. at 13–15. In *Alice* Step

Two, the question is whether the "patent in practice amounts to significantly more than a patent upon the [abstract idea] itself.'" *Alice*, 573 U.S. at 217–18. If Google is correct that claim 17 is directed to an abstract idea (Step One), then the proper question is whether the claim amounts to more than *that abstract idea*. Courts have occasionally noted that a claim recites only an abstract idea without providing a mechanism to accomplish that idea.

For example, in Google's lead case, the Step One abstract idea was "remotely accessing user specific information." *Intell. Ventures I LLC v. Erie Indem. Co.*, 850 F.3d 1315, 1330 (Fed. Cir. 2017). On Step Two, the court held that the claim "does not provide an inventive solution to a problem in implementing the idea of retrieving user-specified information; it simply recites that the abstract idea will be implemented using the conventional components and functions generic to electronic mobile devices." *Id.* at 1331. The patentee further argued that the claimed implementation provided previously unavailable functionality, overcoming "compatibility issues." *Id.* But because neither the claims nor the specification had any limitation or disclosure of addressing purported compatibility issues, that "purported feature" could not provide an inventive concept. *Id.* at 1331–32. In short, the *Erie* court asked two almost unrelated questions: (1) did the claims provide an inventive solution to the Step One abstract idea—an unconventional implementation of that same idea? and (2) was there any support for the patentee's argument that the invention overcame "compatibility issues" that were not recited in either the claims or the specification? The quotations relied on by Google regarding a "mechanism" for "how the result is accomplished" relate to the second issue.

Nothing in *Erie* or any other case suggests that *Alice* Step Two involves a "how" inquiry into *every individual claim limitation* (as opposed to the intended result of the invention as a whole). Here, if the Court accepts Google's argument on Step One, *e.g.* that the claim is "directed

to the abstract idea of distributing applications with files that are used in place of, or filter the output of, local application libraries," Mot. at 7,[2] the question on Step Two is whether the claims provide an inventive concept over *that same abstract idea*. For example, if the claim describes an unconventional way to use files distributed with the application in place of local application libraries—if it recites "how" to perform that function in an unconventional way—then *Alice* Step Two is satisfied.

As explained more fully above, the '762 Patent both explains and expressly claims an inventive and unconventional method that enables executing applications on an "incompatible computer platform." Part of the innovation was to accomplish that result by using "second group of files in place of the associated local system files normally used to perform a same task," which as discussed above was one of the points of novelty argued during prosecution.

The claim also accomplishes its desired result using "runtime software including a kernel module resident in kernel mode and at least one application filter library resident in user mode." Google has presented neither evidence nor argument that such runtime software was a well-known or conventional solution to the claimed problem, even under its own framing (*i.e.*, that such runtime software was a conventional and generic way to use files distributed with the application in place of local application libraries). *See* Mot. at 14 (listing ten "how" or "which" questions, none of which involve this portion of the claim).

Instead, Google seems to believe that *Alice* Step Two encompasses some sort of super-

---

[2] To be clear, claim 17 does not require "distributing applications with files that… filter the output of[] local application libraries." There is no "distributing" step. And the claim requires "filtering one or more system service requests made by *the first software application*," not filtering the "output of… local application libraries" as Google suggests. Furthermore, the "filter" limitation is associated with the "runtime software" limitation, 17(c); the runtime software need not be part of the set of first files (application and associated files) of limitation 17(a).

charged version of the Section 112 enablement analysis: that the patent must explain "how" to accomplish *every individual limitation* recited in the claim. Google's very first bullet point illustrates the absurdity of that rule, demanding some sort of additional explanation "*how* to 'provid[e] a computer readable set of first files.'" Mot. at 14 (emphasis original).

What sort of "how" could possibly satisfy Google's test? (To be clear, Google omits most of the limitation in question, which specifies *what* the set of first files must contain.) Would Google be satisfied if the claim counterfactually recited "storing, in a non-volatile memory accessible to the incompatible computer platform, a computer readable set of first files," thereby specifying *how* to provide the files? Of course not: the claim does not explain *how* to "stor[e], in a non-volatile memory," *et cetera*, *et cetera*. No matter what the claim said, Google could ask: "but *how*?", evoking the "why, why, why" litany familiar to parents of small children.[3]

Google's "how, how, how" is childish not just in tone but in substance: the child's "why, why, why" questioning goes on forever precisely because the child has learned that "why" is an easy response to almost any explanation. Google's "how" analysis, ironically, fails to address "how" the "how" requirement is not satisfied, beyond merely showing that a "how" question can be formulated for each limitation—as with almost any limitation. Of course, a person of ordinary skill in the art would understand how to follow the patent's instructions to, for example, provide a computer-readable first set of files with specified contents, execute specified files, and so forth.

As noted above, the patent eligibility analysis does not require an evaluation of "how" for each and every claim limitation. But even if it did, to the extent more complex limitations (beyond, e.g., providing a set of files) legitimately raised questions of whether the "how" is adequately

---

[3] *See generally* https://www.kindercare.com/content-hub/articles/2017/march/why-why-why-do-some-3yearolds-ask-why-all-the-time (providing an example of this repetitive, seemingly endless inquiry).

specified, that is a question of *fact* requiring expert analysis. For example, whether a POSITA would understand whether the claims provide sufficient detail in view of the claims and intrinsic record requires input from a POSITA, and Google does not even attempt to show that this is a question that can be resolved without resolving disputes of fact after discovery.[4]

Claim 17 is patent-eligible. At minimum, the facts here—which must be accepted as true and contradict Defendants' conventionality argument—raise factual disputes precluding dismissal. *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1126–28 (Fed. Cir. 2018).

**C.    Google also fails to show ineligibility for any other claim.**

The other asserted claims of the patent provide unique additional requirements, representing additional inventive concepts under *Alice* Step Two. For example, claim 20 provides even further implementation detail, specifying that "the first set of files is a set of capsule files." The word "capsule" is used extensively within the '762 Patent specification in describing the advance over the art. *See, e.g.*, '762 Patent at 4:51–5:12, 6:14–7:2, 7:59–10:17, 10:37–15:11, and Figs. 4, 7, 10, 13; *see also id.* at 6:14–6:49 (beginning of a discussion that describes "capsule environment" and "capsule operation" in a way that is distinguished from "traditional application models"). "Capsule" is used in a potentially similar sense to the word "container" that appears in the '814 Patent specification, which is incorporated by reference into the '762 Patent specification. '762 Patent at 1:18–24. Google and VirtaMove disputed the construction of "container" in the '814 Patent, before agreeing to a compromise construction. *VirtaMove v. Google*, No. 7:24-cv-00033-DC-DTG, Dkt. 63 at 8–10, Dkt. 65 at 10–12, Dkt. 66 at 3, Dkt. 720 at 6. Google will likely seek construction of "capsule" in the '762 Patent as well. Evaluating claim 20 at this preliminary stage

---

[4] Additional discussion of the claimed details regarding *how* each claimed step must be performed is provided above in Section III.A, starting at page 8.

would invite inconsistent arguments. For example, Google might argue for Section 101 purposes that claim 20 is broad—perhaps coextensive with independent claim 17—and thus provides no inventive concept; but during *Markman* it might argue that "capsule" imports strict limitations from the specification, with an eye towards non-infringement. Since Google has *not* proposed any construction for "capsule" in its motion, the interpretation of this term should be addressed during the normal *Markman* process, and claim 20 should not be invalidated at this premature stage.

## IV.  <u>INFRINGEMENT</u>

### A.  **Direct infringement is well pleaded.**

Google has not articulated any coherent reason for dismissing direct infringement. The complaint unambiguously alleges Google's direct infringement making, using, selling, and offering for sale the various Accused Products. Dkt. 1 ("Compl.") ¶ 16. Each of these is a directly infringing activity. And the attached infringement chart (incorporated by reference into the complaint) provides specific allegations of infringement. *Id.* ¶ 20; Dkt. 1-2 (charting 36 pages of how Google Kubernetes Engine infringes every element of claim 17 of the '762 Patent).

The *only* element that Google asserts is missing is "filtering one or more system service requests… to modify values that otherwise would have been returned by the local operating system." Mot. at 15–16. Its only arguments are that the word "filter" is absent from the cited documentation and that a web page cited in the chart describes naming a cat "fluffy." Mot. at 16. But Google is simply ignoring relevant allegations that support the limitation.

As one non-limiting example of infringement, explained in documentation quoted in the claim chart (but not cited in Google's motion), the "container runtime" software executing within Google Kubernetes Engine enforces resource limits, for instance limits on memory usage. Dkt. 1-

2 at 35. In GKE, one example of a "container runtime" is the software "containerd." *Id.* at 30. The documentation states:

> If you set a memory limit of 4GiB for that container, the kubelet (and ***container runtime***) ***enforce the limit***. The runtime prevents the container from using more than the configured resource limit. For example: ***when a process in the container tries to consume more than the allowed amount of memory, the system kernel terminates the process that attempted the allocation, with an out of memory (OOM) error***.

*Id.* at 35 (emphasis added). In this example, if the container runtime were not enforcing the memory limit and the process attempted to allocate additional memory (*i.e.*, sent a request to the operating system for additional memory), the operating system would respond by providing the requested memory. However, with the container runtime in place and filtering the system service requests made by the containerized application, a different response is provided instead: an out of memory error. This is precisely what the claim language requires.

Indeed, this exemplary infringement allegation closely tracks a non-limiting example in the '762 Patent specification:

> As the software application associated with or contained in a capsule is executed it is monitored through the use of system service filters. Turning now to FIG. 6, the application 60 is shown making a system call. The system service filter 61 ***filters the system call*** before original kernel services 62 are accessed. The system service filter 61 is shown monitoring process creation, I/O activity, ***memory usage*** and CPU usage 65.... The information gathered in this manner is used to track which processes are associated with a capsule, their aggregate ***hardware resource usage*** and to ***control specific values returned to the software application***. Hardware resource usage includes CPU time, ***memory***, file activity and network bandwidth 65.

'762 Patent at 12:14–32. VirtaMove alleges that in Google's infringing functionality, the container runtime monitors hardware resource usage (memory allocation) by filtering allocation requests, and controls specific values returned to the software application by sending an out of memory error when the resource usage exceeds a predefined limit. This allegation is more than sufficient to survive Google's motion to dismiss.

17

To the extent the Court is inclined to grant Google's motion as to direct infringement, it should grant leave to amend the complaint to more specifically and extensively allege the presence of this limitation. The complaint has not previously been amended, and as Google's own brief demonstrates there is additional public documentation potentially relevant to this limitation.

**B.     Induced infringement is well pleaded.**

Google argues for dismissal of induced infringement for two reasons: (1) that Google did not know that the alleged acts infringe, and (2) Google did not know that its promotion of products induces others to infringe. Both of these arguments stem from Google's dispute of the underlying facts for the reasons discussed in the preceding section—a type of factual dispute that is improper at the pleading stage. The facts make it plausible to infer that Google pretended to be interested in partnering with VirtaMove, inducing the VirtaMove to share its technology, and then kicking VirtaMove to the curb. During this process, either Google knew from due diligence that the technology it was taking was patented, or Google was willfully blind. Then, "VirtaMove's technology from its demos and disclosures appears to have made their way into the Accused Products of Google." Compl. ¶ 10. It is plausible to infer that Google would have known that it induces infringement when its customers use the technology that was taken from VirtaMove.

As to direct infringement by customers, the pleading specifically alleges that Google's "customers [] infringe the '762 patent through the customers' normal and customary use of the Accused Products." Compl. ¶ 18. As supported in the claim charts, this is sufficient.

Google's final argument, that the complaint lacks allegations of "culpable conduct," fails because it is specifically pleaded that Google "continues to actively encourage and instruct their customers and end users (for example, through user manuals and online instruction materials on its website) to use the Accused Products in ways that directly infringe." Compl. ¶ 18. This is

18

sufficient to infer culpable conduct, and similar language has been ruled sufficient to infer specific intent. *See, e.g.*, *BillJCo, LLC v. Apple Inc.*, 583 F. Supp. 3d 769, 780 (W.D. Tex. 2022) ("Apple takes specific steps to actively induce others—such as, for example customers, application developers, and third-party manufacturers—to access, use, and develop programs and applications for the Accused Instrumentalities and intentionally instructs infringing use through training videos, demonstrations, brochures, installation and user guides . . . ."). Given the similar allegations here, the motion to dismiss post-suit induced infringement should be denied.

### C. Contributory infringement is well pleaded.

The complaint also sufficiently pleads the elements of contributory infringement. It is alleged that Google has servers that execute applications according to the claimed method. Dkt. 1-2 at 1. Under one alternative theory, Google contributes to infringement by providing these specially configured servers so that Google's customers can run the customers' applications on them, causing infringement of the rest of the claim. Compl. ¶¶ 19–20; Dkt. 1-2 (generally). Such servers, once specially configured as recited in the asserted patents, are no longer staple articles, nor are they suitable for noninfringing uses.

### D. Pre-suit knowledge is well pleaded.

The complaint also pleads sufficient pre-suit knowledge of infringement to support induced and contributory infringement. These facts include: (1) Google met with representatives of VirtaMove in 2015, 2020, and 2021 for the purpose of partnering with VirtaMove, demoing the AppZero products, training Google how to use AppZero, and allowing Google to run and evaluate AppZero, (2) Google discussing the integration of AppZero into Google Cloud, such that VirtaMove shared its materials about how AppZero works, (3) Google would have learned from

due diligence that AppZero was patented or chose to remain willfully blind during this process, and (4) VirtaMove's technology made their way into the infringing Google products. Compl. ¶ 10.

Google raises, at most, a factual dispute about whether it learned that AppZero was patented during its due diligence—a dispute that must be resolved in VirtaMove's favor at the pleading stage. Such due diligence, including the investigation of patents, is standard procedure when discussing tech partnerships. *See* Exhibit 3 (reporting that IBM conducted "due diligence" under similar circumstances). Thus, Google would have either known the technology that it stole was patented from due diligence, or Google chose to skip the customary type of due diligence that IBM performed so that Google could remain willfully blind. These facts allow the Court or jury to infer that Google knew that Google's later-developed product using VirtaMove's technology infringes VirtaMove's patents.

### E.    Post-suit knowledge also prevents dismissal of indirect infringement.

Even if the Court finds a lack of pre-suit knowledge, the Court should not dismiss post-suit indirect infringement allegations (induced and contributory infringement) because Google has not challenged post-suit knowledge or post-suit indirect infringement. *See BillJCo, LLC v. Apple Inc.*, 583 F. Supp. 3d 769, 777–778, 780 (W.D. Tex. 2022) (denying motion to dismiss post-suit indirect infringement). After *BillJCo*, post-suit knowledge (e.g., via the complaint) is sufficient for post-suit indirect infringement.

## V.    <u>CONCLUSION</u>

The motion should be denied in its entirety. If the Court is inclined to grant any part of it, VirtaMove should be given leave to amend its pleadings. *Aatrix*, 882 F.3d at 1126. As to indirect infringement, if the Court is inclined to grant the motion, the Court should instead grant Plaintiff leave to amend its complaint up to three months into fact discovery, as is the usual practice in the Western District of Texas. *See BillJCo*, 583 F. Supp. 3d at 782.

Dated: November 3, 2025        Respectfully submitted,


By: *Christian W. Conkle*

Reza Mirzaie (CA SBN 246953)
rmirzaie@raklaw.com
Marc A. Fenster (CA SBN 181067)
mfenster@raklaw.com
Neil A. Rubin (CA SBN 250761)
nrubin@raklaw.com
James A. Milkey (CA SBN 281283)
jmilkey@raklaw.com
Jacob Buczko (CA SBN 269408)
jbuczko@raklaw.com
James Tsuei (CA SBN 285530)
jtsuei@raklaw.com
Christian W. Conkle (CA SBN 306374)
cconkle@raklaw.com
Jonathan Ma (CA SBN 312773)
jma@raklaw.com
Daniel B. Kolko (CA SBN 341680)
dkolko@raklaw.com
**RUSS AUGUST & KABAT**
12424 Wilshire Boulevard, 12th Floor
Los Angeles, CA 90025
Telephone: (310) 826-7474

Qi (Peter) Tong (TX SBN 24119042)
**RUSS AUGUST & KABAT**
8080 N Central Expy, Suite 1503
Dallas, TX 75206
Telephone: (310) 826-7474

*Attorneys for Plaintiff VirtaMove, Corp.*

21

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that this document is being served via ECF on November 3, 2025 to all counsel of record.

*/s/ Christian W. Conkle*
Christian W. Conkle
